IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| JORDAN RIVER RESTORATION NETWORK, d/b/a THE SPIRIT OF UTAH WILDERNESS, INC., a Utah non-profit corporation; JEFF SALT, an individual; DANNY POTTS. an individual; KRISTINE VICKERS, an individual; ERIC HARVEY, an individual; and GAYANNE K. SCHMID, an individual,<br><br>    Plaintiffs,<br><br>vs.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS, SACRAMENTO DIVISION, UTAH REGULATORY OFFICE; COLONEL WILLIAM J. LEADY, District Engineer of the Sacramento District; and JASON GIPSON, Chief of Nevada-Utah Regulatory Branch,<br><br>    Defendants,<br><br>and<br><br>SALT LAKE CITY CORPORATION, a municipal corporation,<br><br>    Internvenor. | FILED IN UNITED STATES DISTRICT COURT, DISTRICT OF UTAH<br><br>APR - 5 2011<br>D. MARK JONES, CLERK<br>BY_____<br>DEPUTY CLERK<br><br><br>ORDER<br><br><br><br>Case No. 2:11-CV-040-DB |

Before the Court is Plaintiffs' Motion for Preliminary Injunction requesting the Court enjoin Defendants from constructing the Salt Lake Regional Athletic Complex near the Jordan River. The Court held a hearing concerning this Motion on March 11, 2011. Plaintiffs were

-1-

represented by Mr. Wade Budge, Defendant U.S. Army Corps of Engineers was represented by Daniel Pinkston, Daniel Price, and Maureen Rudolph, and Intervener Defendant Salt Lake City Corp. was represented by Edwin Rutan and Evelyn Furse. After consideration of the briefs submitted by the parties and the oral arguments presented by counsel, the Court enters the following Order.

**1.    Background**

In 2003, Salt Lake City residents approved a $15.3 million bond to finance the construction of an athletic complex. The city wanted a project large enough to provide fields for local sports teams as well as facilities capable of hosting national tournaments.

After the bond was approved, city planners began searching for a suitable location for the complex. They eventually settled on a 142-acre parcel of land adjacent to the Jordan River in a relatively undeveloped section on the northern boundary of Salt Lake City. The site appeared to contain some wetlands. Accordingly, the city contracted with SWCA Environmental Consultants to determine the extent of the wetlands.

Based on the study of its expert consultant, the city initially determined that the proposed site contains 1.73 acres of jurisdictional wetlands located in approximately 16 small areas scattered over the project.

Because of the presence of wetlands on the site, the city was obligated under federal law, notably the Clean Water Act, to obtain a Section 404 permit from the Army Corps of Engineers before the city could proceed. Therefore, on November 24, 2009, the city, through its expert, SWCA Environmental Consultants, submitted a "Wetland Delineation of the Regional Athletic Complex Study Area" to the Corps. The Delineation stated that the "Study Area" for the

proposed permit was 165 acres, which included 1.73 acres of jurisdictional wetlands.

Later, on April 12, 2010, the city submitted an updated "Wetland Delineation of the Salt Lake City Complex Restoration Area," to the Corps. This document reported on the wetlands in a portion of the site, designated as the "restoration area," which comprises a 23-acre section of property abutting the west bank of the Jordan River. It was determined that this 23-acre section of the property contained approximately 0.048 acres of wetlands.

On April 30, 2010, the city filed with the Corps a "Mitigation and Monitoring Plan for Construction of the Regional Athletic Complex: Utah Regulatory Branch." This plan proposed that the 23-acre restoration area would remain undeveloped, and would be restored with native and riparian vegetation. This area would also be the location for the creation of 3.0 additional acres of wetland as mitigation for the proposed elimination of 1.35 acres of jurisdictional wetlands on the site of the 142-acre athletic complex.

On May 6, 2010, the city submitted a Section 404 Permit Application. This application included lengthy descriptions of the project purpose, reasons for the proposed discharge of dredged or fill material into "wetlands," and other information regarding the financial aspects of the project. After the application was received, the Corps issued a preliminary jurisdictional wetlands determination, approving the city's Delineation. The Corps' "Preliminary Jurisdictional Determination Form" states that Corps personnel conducted on-site visits of the proposed project area on December 11, 2009, and again on April 16, 2010.

On June 2, 2010, the Corps issued a Public Notice seeking comments on the proposed project. The Public Notice presented six different site alternatives for consideration -- two on-site at the Jordan River location and four off-site. The Public Notice also sets forth the proposed

mitigation, consisting of building three acres of wetlands, along with the creation of a fifty-foot native upland buffer within the Jordan River riparian area. The Corps originally set the time frame for receipt of comments as June 1, 2010, through June 25, 2010, and then extended the formal public comment period for an additional two weeks until July 9, 2010, at Plaintiffs' request. The Corps received only one comment letter from the public on the proposed project during the formal comment period--from Plaintiffs. After the formal comment period had passed, the Corps received one letter from the United States Fish and Wildlife Service and a letter from the Public Lands Policy Coordination Office on behalf of the Utah Divisions of Air Quality and Water Quality.

On July 16, 2010, after reviewing the submitted comments, the Corps requested further information from the city on compliance with Clean Water Act. On August 13, 2010, the city responded with its "404 Permit Application Responses." This document elaborated on the city's compliance with the Act, discussed alternative sites and designs in detail, included a matrix with responses to all comments received (including those submitted by the Corps, U.S. Fish and Wildlife Service, Utah Department of Environmental Quality, and Jordan River Restoration Network), elaborated on the financial requirements and assumptions underlying the claimed project purpose, and included traffic studies. On November 22, 2010, four and a half months after the close of the formal comment period, Plaintiffs' consultant, Kagel Environmental, LLC, submitted a letter to the Corps, criticizing the Delineation relied upon by the city and approved by the Corps.

On November 23, 2010, the Corps issued a section 404 CWA permit to the city for the Complex. In support of the permit, the Corps issued a "Permit Decision" document, which

includes the Corps' CWA compliance, the Public Interest Review, Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI"). The EA responds to all of the comments received and considers in detail a no-action alternative, three onsite alternatives and five off-site alternatives (including those alternative sites proposed by Plaintiffs in their comments). The EA concludes that the proposed location of the Complex best meets the project's overall purpose and need.

Along with analyzing the eight alternatives in terms of the purpose and need for the project, the EA also analyzes the potential impacts of the proposed alternative versus the no-action alternative in terms of: (1) the physical and chemical characteristics (including impacts to the substrate soils, water circulation, suspended particulates and turbidity, normal water level fluctuations, flood hazards and floodplain values, storm, wave and erosion buffers, erosion and accretion patterns, water quality, aquifer recharge, base flow and mixing zone); (2) biological characteristics (including special aquatic sites, aquatic species in the food web, wildlife values, threatened and endangered species, and the biological availability of any possible contaminants); (3) human use characteristics (including water supply and conservation, aesthetics, traffic and transportation patterns, noise impact and mitigation, recreation, recreational and commercial fisheries, navigation, energy needs, mineral needs, economics, food and fiber production, prime and unique farmland, consideration of the residential subdivision to the south, land use, historic properties and air quality); (4) indirect effects (including potential increased traffic, increased property values, alleviation of the scheduling pressures on the existing soccer fields, wetland mitigation, reuse of irrigation water); and (5) the cumulative effects of the project to the surrounding vicinity.

The EA is also conditioned on the mitigation plan. The mitigation plan requires the city to construct three acres of palustrine emergent and shrub/scrub wetlands within the on-site "restoration area" and sets forth criteria by which to measure the success of the mitigation, and requires long-term monitoring of the mitigation area. The mitigation plan requires the initiation of construction of the new wetlands to begin before April 1, 2011, and completion of the mitigation by June 15, 2011.

With these details in mind, the Court turns to the legal questions before it.

## 2. Discussion

Plaintiffs have moved for a preliminary injunction, which, if granted, would stop construction on the site pending a resolution of this case on the merits. "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). The movant's "requirement for substantial proof is much higher" when seeking a preliminary injunction than for summary judgment. *Id.*

To prevail on a motion for a preliminary injunction, the movant must demonstrate each of the following: a) a substantial likelihood of prevailing on the merits; b) irreparable harm will occur unless the injunction is issued; c) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and d) the injunction, if issued, will not adversely affect the public interest. *Federal Lands Legal Consortium v. United States*, 195 F.3d 1190 (10th Cir. 1997); *See also* Fed. R. Civ. P. 65. If a movant fails to meet its burden on any of these four requirements, its request must be denied. *Winter v. Natural Res. Def. Council*, 129 S. Ct. 365, 374 (2008).

There is debate between the parties as to whether the modification of the "substantial likelihood of prevailing on the merits" prong by the Tenth Circuit's *Federal Lands* case resulting in a relaxed standard is still valid, or if that standard has been invalidated by the United States Supreme Court decision *Winter v. Natural Res. Def. Council* cited above. The Court need not address this question because it finds that even accepting the relaxed standard, Plaintiffs have failed to carry their burden.

    a.    **Plaintiffs failed to demonstrate a substantial likelihood that they would prevail on the merits.**

Plaintiffs argue that there is a substantial likelihood that they will prevail on the merits because, as Plaintiffs suggest, there are "questions going to the merits [that] are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *See* Plaintiffs' Memorandum in Support at 8 (quoting *Federal Lands* 195 F.3d at 194-95). The Court disagrees with Plaintiffs' assessment and finds that Plaintiffs' "questions going to the merits" are merely unsubstantiated assertions.

Plaintiffs claim that the permit was based on a fundamentally flawed and incomplete wetlands delineation, rendering the permitting decision arbitrary and capricious. Plaintiffs argue, among other things, that the Delineation failed to include many additional acres of wetlands. Moreover, Plaintiffs claim that because the delineation is flawed, the Corps failed in its obligation under the National Environmental Procedures Act ("NEPA") to accurately and completely evaluate the affected environment and describe the project's impacts on it. Plaintiffs' Memorandum in Support at 9. Plaintiffs, however, have failed to provide this Court with compelling evidence substantiating these claims.

The evidence offered by Plaintiffs consists of a National Wilderness Inventory map

("NWI map") and a declaration by Ray L. Kagel, Jr. Mr. Kagel's declaration, however, has been stricken by the Court in a previous order because it is inappropriately based on a two-hour visit to the site on February 11, 2011, during which representatives of the city and Plaintiffs met, at the request of the Court, at the site in an effort to agree on a preservation of the status quo pending a determination of the merits of the Plaintiffs' Motion for a Temporary Restraining Order. Thus, the declaration will not be considered by the Court here.

The NWI map is a map prepared by the U.S. Fish and Wildlife Service and is used to gather a rough estimate of the amount of wetlands in certain areas. The map is created through use of aerial photography and photographic interpretation of vegetation patterns. The term "wetlands" is defined by the CWA as areas "inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 328.3(b). To be delineated as a wetland, there must be analysis of vegetation, soils and hydrology under normal circumstances. The NWI mapping process is limited to an aerial analysis of vegetation, visible (i.e., surface) hydrology and land forms only.

In contrast to NWI map's limited aerial analysis, Defendants offer the declaration of Hollis G. Jenks, a Corps employee with vast experience in this area. In his declaration, Mr. Jenks states that the Delineation was proper and its calculation of wetlands accurate. *See* Declaration of Hollis G. Jenks at 5. Mr. Jenks came to this conclusion after visiting the site where he conducted various tests including digging six test pits in an effort to find and examine hydrology and soils. *Id* at 3.

On the present state of the record, Defendants' evidence is stronger and more persuasive

than anything Plaintiffs present. Plaintiffs' evidence in support of the present Motion presents no serious questions concerning the validity of the Delineation. An examination of the record, irrespective of Mr. Jenks' declaration, persuades the Court Defendants properly followed all relevant procedures in preparing the Delineation. For these reasons, the Court finds that Plaintiffs have failed to demonstrate a substantial likelihood of success on the merits of their claim the Delineation was improper.

Plaintiffs assert the Corps failed in its NEPA obligation to rigorously explore and evaluate reasonable alternatives to locating the Complex on the site. However, the Court is satisfied that the evidence supports a finding that the project as permitted is the "least environmentally damaging practicable alternative."

The relevant guidelines provide that a section 404 permit should not be issued "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). An alternative is considered "practicable" if it is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2). If the activity for which a section 404 permit is sought is not "water dependent," that is, "does not require access or proximity to or siting within" a "special aquatic site," such as a wetland, there is a presumption that "practicable alternatives that do not involve special aquatic sites are . . . available, unless clearly demonstrated otherwise." *Id.* § 230.10(a)(3). In addition, where the proposed discharge is into a wetland, practicable alternatives not involving a discharge into a special aquatic site "are presumed to have less adverse impact on the aquatic ecosystem, unless

clearly demonstrated otherwise." *Id.* However, "'[c]lassification of an activity as "non-water dependent" does not serve as an automatic bar to issuance of a permit . . . [it] simply necessitates a more persuasive showing than otherwise concerning the lack of alternatives.'" *Sylvester v. U.S. Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir. 1989) (quoting *La. Wildlife Fed'n, Inc. v. York*, 603 F. Supp. 518, 527 (W.D.La. 1984)), *aff'd in part and vacated in part*, 761 F.2d 1044 (5th Cir. 1985)).

In performing the practicable alternatives analysis, the Corps "has a duty to consider the applicant's purpose." *Sylvester*, 882 at 409. In fact, "it would be bizarre if the Corps were to ignore the purpose for which the applicant seeks a permit and to substitute a purpose [the Corps] deems more suitable." *La. Wildlife Fed'n, Inc*, 761 F.2d at 1048. When considering potential practicable alternatives, the Corps may base its permit decision on information exclusively provided by the applicant, *Friends of the Earth v. Hintz*, 800 F.2d 822, 835 (9th Cir. 1986), although it cannot "uncritically accept the applicant's assessment as to practicable alternatives." *Great Rivers Habitat Alliance v. U.S. Army Corps of Eng'rs*, 437 F. Supp.2d 1019, 1027 (E.D. Mo. 2006). The Corps "may legitimately consider such facts as cost to the applicant and logistics," as well as safety questions. *Sylvester*, 882 F.2d at 409; *Great Rivers Habitat Alliance*, 437 F. Supp.2d at 1034. However, an agency need not consider alternatives that are unreasonable, remote, speculative, impractical, or ineffective and the Court should "uphold an agency's discussion of alternatives so long as the alternatives are reasonable and the agency discusses them in reasonable detail." *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1164-72 (10th Cir. 2002); *Davis v. Mineta*, 302 F.3d 1104, 1121 (10th Cir. 2002); *Ass'n Working for Aurora's Residential Env't ("AWARE") v. Colo. Dep't of Transp.*, 153 F.3d

1122, 1130 (10th Cir. 1998); *Holy Cross Wilderness Fund v. Madigan*, 960 F.2d 1515, 1528 (10th Cir. 1992) (quotation marks, alteration and citation omitted).

As stated above, the Complex's purpose is to provide an athletic venue for youth and adults as well as attracting regional and national tournaments. The record indicates that the site was chosen "because it was of sufficient size and orientation, boasted excellent access to Interstate 215, the airport, and downtown Salt Lake City, had no conflicting land use issues that could not be mitigated," and the landowner, the Utah Division of Parks and Recreation, was willing to agree to a land transfer contingent on the site becoming an athletic facilities complex. Admin. Rec. COE 663.

After the public comment period on the proposed permit was over, the Corps wrote to the city asking the city to provide additional information regarding practicable alternatives, justification for the purpose and need for a project of the size proposed, minimization of impacts, offsite alternatives, and other information. Admin. Rec. COE 514-16.

The city responded with its "Salt Lake City Regional Athletic Complex, 404 Permit Application Responses, August 2010." Admin. Rec. COE 153-299. The Responses included an explanation of why the proposed project was the least environmentally damaging practicable alternative, and a "Project Sites Alternatives Analysis." Admin. Rec. COE 168-76. The Alternatives Analysis reviewed five off-site alternatives and three design alternatives for the project. Each was ranked according to ownership/availability; size, shape and topography; zoning; proximity to development; wetland impacts; floodplain; accessibility; aesthetics; economics; social economic impacts; and "other relevant factors." *Id.*

In the Permit Decision, the Corps considered each of the five off-site and three-onsite

alternatives in light of Clean Water Act and NEPA requirements. Admin. Rec. COE 11-13. The Corps determined that each of the proposed alternatives was not practicable, in light of project purposes, due to cost and/or logistical constraints and granted the city a permit for the site.

The Court finds support in the record for this determination, and finds that the reasons stated in the Administrative Record, particularly those stated in pages COE 11-13 to be valid and sufficient to rebut the presumption. The level of detail included in the Permit Decision appears to be appropriate, and supported in the administrative record. For these reasons, and those stated in Defendants' Response Brief, the Court finds Plaintiffs are unlikely to demonstrate that Defendants failed to reasonably evaluate alternative sites.

For the forgoing reasons, the Court finds that Plaintiffs failed to show that they are likely to succeed on the merits.

### b. Plaintiffs failed to show that irreparable harm will occur if the injunction is denied.

As mentioned above, Plaintiffs have failed to show a substantial likelihood of success on their claims that there are additional wetlands at the site. As such, much of the injury claimed by Plaintiffs is irrelevant. However, even if additional wetlands were shown to exist (and that those wetlands are jurisdictional), Plaintiffs have not shown that the actions of the city would result in irreparable injury.

The CWA grants district courts the authority to order restoration of jurisdictional wetlands that have been unlawfully filled to remedy the harm resulting from the violations. *Ogeechee- Canoochee Riverkeeper, Inc. v. T.C. Logging, Inc.*, 2010 WL 1009797, at *2 n. 2 (S.D. Ga. Mar. 18, 2010); *United States v. Donovan*, 466 F. Supp. 2d 595, 598 (D. Del. 2006). Courts frequently order restoration of damaged or destroyed wetlands as injunctive relief for

violations of wetland permitting requirements. *United States v. Deaton*, 332 F.3d 698, 714 (4th Cir. 2003); *United States v. Cumberland Farms of Conn., Inc.*, 826 F.2d 1151, 1164-65 (1st Cir. 1987). In addition, it is common in the settlement of CWA wetland enforcement cases to require restoration of unlawfully affected wetlands by defendants. Indeed, such an outcome might result in a difficult and expensive endeavor for those who unlawfully harm wetlands, but mere difficulty and expense does not constitute "irreparable injury." This is especially true when there is precedent for a successful court-ordered remedying of the harm in question.

For these reasons, and those outlined in Defendants' Response, the Court finds that Plaintiffs failed to show that irreparable harm will occur if the injunction is denied.

## 3. Conclusion

As previously stated, a movant seeking a preliminary injunction must prove all four elements to prevail. Because Plaintiffs failed to carry their burden and prove that they would likely succeed on the merits and that irreparable injury will occur without a preliminary injunction, the Court need not address elements three and four. For these reasons, the Court **DENIES** Plaintiffs' Motion for Preliminary Injunction.

It is so **ORDERED.**

DATED this 5th day of April, 2011.

_____
Dee Benson

United States District Judge